*u*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DAVID JACOBS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 03 C 3549 |
| | ) |
| | ) Judge Mark Filip |
| XEROX CORPORATION LONG TERM | ) |
| DISABILITY INCOME PLAN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

David Jacobs ("Jacobs" or "Plaintiff") brings this action against the Xerox Corporation

Long Term Disability Income Plan ("Plan" or "Defendant") under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. (D.E. 10 ("Second Amended

Complaint").)¹ In an opinion dated January 19, 2005, the Court denied Plaintiff's summary

judgment motion and granted Defendant's summary judgment motion as to Counts I and III of

the complaint. (D.E. 58.)

The sole remaining count is Count II, in which Plaintiff alleges that he is entitled to civil

statutory penalties because he was not provided, upon suitable request, with ERISA plan

documents, pursuant to 29 U.S.C. § 1132(c). On June 10, 2005, the Court held an evidentiary

hearing on Plaintiff's Section 1132(c) claim. (D.E. 73.) The parties filed post-trial briefs, which

the Court has reviewed along with the evidence presented at the hearing. For the reasons stated

below, the Court finds for Defendant on the Section 1132(c) claim.

---

¹ The docket entries in this case are designated as "D.E. ___."

I.    Facts [2]

The Court assumes familiarity with the account of the dispute set out at length in the prior

opinion in the case. *See Jacobs v. Xerox Long Term Disability Income Plan*, 356 F. Supp. 2d

877 (N.D. Ill. 2005). Therefore, the Court relates only the facts necessary to decide Plaintiff's

Section 1132(c) claim.

In this case, the Summary Plan Document ("SPD") contains an "Administrative

Information" section at the end of the document, which specifically advises participants in the

Plan of their right to "[o]btain copies of all plan documents and other plan information as

required by ERISA upon written request to the Plan Administrator." (Def. Ex. A. (also, "SPD")

at 144; Tr. at 30.)[3] The SPD further provides that "the plan administrator for each ERISA

governed welfare plan described in this book is Patricia M. Nazematz, Xerox Corporation, 800

Long Ridge Road, P.O. Box 1600, Stamford, Connecticut 06904, Telephone: 203-968-3000."

(Def. Ex. A at 146; Tr. at 30-31.) Defendant has stated, and Plaintiff does not dispute, that Mr.

Lawrence Becker subsequently became the Plan Administrator, and that his office location

remained the same as Ms. Nazematz. (D.E. 76 at 3 n.1.)

The SPD also states, in a separate section discussing eligibility for long-term disability

_____

[2] The Court hereby enters the following Findings of Fact and Conclusions of Law, which
are expressly based upon consideration of all the admissible evidence, as well as the Court's own
assessment of the credibility of the witness and probative value of evidence submitted. As Judge
Castillo stated in a similar context, to the extent any finding of fact stated might be deemed a
conclusion of law, it should be considered a conclusion of law. *See Quela v. Payco-General Am.
Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D. Ill. May 18, 2000). The same is
true as to any stated conclusion of law. *See id.* Any disputed evidence, to the extent not
expressly otherwise discussed herein, is construed in support of the result reached in this opinion.

[3] The various transcript citations for the June 10, 2005 evidentiary hearing (D.E. 75) are
designated as "Tr. __."

2

benefits, that participants should "[a]sk . . . [their] Human Resources representative for information." (Def. Ex. A at 97; Tr. at 34.)

On March 5, 2002, Plaintiff's former counsel, Mr. Dominick Faraci, wrote to Ms. Ellen Rogowski, a Human Resources Manager at Xerox; he addressed his letter to 400 South Executive Drive, Brookfield, Wisconsin, 53000 ("March 5, 2002 Letter"). (Pl. Ex. 1; Tr. at 12.) It is unclear where Mr. Faraci got the address to write to Ms. Rogowski. The address provided in the SPD for the Plan Administrator (Stamford, Connecticut) was not the address to which Mr. Faraci sent his letter (Brookfield, Wisconsin). (Def. Ex. A at 146.) On cross-examination at the evidentiary hearing, Defendant's counsel showed Mr. Faraci a copy of the SPD, and Mr. Faraci stated that he did not believe that he had ever seen the SPD before. (Tr. at 28-30.[4])

---

[4] During briefing leading up to the evidentiary hearing/bench trial on the Section 1132 claim, Plaintiff, then represented by counsel other than Mr. Faraci, argued that Mr. Faraci was misled by statements in the SPD. (*See* D.E. 70 at 3 ("In this instance, the Summary Plan Description was the source of the misleading 'statements' on which Jacobs and his counsel relied when requesting Plan documents and therefore the Plan is a proper and necessary defendant in Jacobs' claim for penalties.").) The evidence presented at the hearing, however, made clear that Mr. Faraci had not seen the SPD—ever—before the hearing itself, as Mr. Faraci readily acknowledged. (*See* Tr. 28 (Q: [Plaintiff's present counsel] said the summary plan description misled you. Did you have the summary plan description?" A. "No."); Tr. at 29 (Q. [Plaintiff's present counsel] indicated that at least you were mis – you had the SPD and were misled by it. Could that be correct?" A. "What is the SPD?" . . . . Q. "Does that [the SPD] look like anything you've seen before?" A. "No."); Tr. at 29-30 (Q. "Have you seen anything that looks like this before?" A. "No. This is not from my file. I've never seen this book [the SPD]." Q. "That's the SPD." A. "I don't know that either.").) In summary, the Court respectfully rejects any theory of Plaintiff's predicated on the idea that Mr. Faraci was misled by any statements in the SPD. When the subject of Mr. Faraci's knowledge of, or reliance on, the SPD was directly addressed with him, he made quite clear that he had not seen the document during the relevant time periods, that he still did not know what the document was, and, therefore, that he was not acting in reliance upon it or was misled by it. Finally in this regard, the Court notes that the SPD specifically stated that a claimant could "[o]btain copies of all plan documents and other plan information as required by ERISA upon written request to the Plan Administrator," and, in that same section, the SPD provided the Stamford, Connecticut address and phone number. (Def. Ex. A. at 144, 146.) Plaintiff notes that other portions of the SPD generically suggest that inquiries

3

In the March 5, 2002 Letter, Mr. Faraci provided some background facts about Mr. Jacobs's situation and requested that "your company please provide me with a complete explanation of what his [Mr. Jacobs's] disability benefits are at this time." (Pl. Ex. 1.) Mr. Faraci retained a copy of the March 5, 2002 Letter, and his copy has handwritten comments on it, apparently written by Mr. Faraci. (*Id.*) The handwritten comments suggest, and Mr. Faraci similarly surmised during his testimony (although he did not seem to have any specific recollection of the subject), that he spoke with Ms. Rogowski on March 18, and that she told him that "Hermina Glaser was the person to address my concerns to."[5] (Tr. at 12; Pl. Ex. 1 (handwritten notation reading, "Ellen said she would talk to Hermina Glaser to call or send letter.").)

On March 12, 2002, Mr. Faraci received a letter from Ms. Hermina Glaser, a lawyer in the Office of General Counsel for Xerox Corporation, who had her office at Xerox Connect, Inc., 4270 Glendale-Milford Road, Cincinnati, Ohio 45242. (Pl. Ex. 2.) Ms. Glaser indicates in this correspondence that Ms. Rogowski sent her a copy of Mr. Faraci's March 5, 2002 letter. (*Id.*)

concerning other, specific subjects may be directed to human resources personnel at Xerox Corporation. (*See, e.g.*, SPD at 108 (discussing whether disability benefits are available for mental illness and substance abuse, and including a toll-free number at the bottom of the page for the Xerox benefits center); SPD at 104 (discussing how disability benefits are calculated where a person is unable to work but is receiving or fails to apply for Social Security disability benefits, and including a toll-free number at the bottom of the page for the Xerox benefits center); SPD at 102 (discussing survivor benefits arrangements, and including a toll-free number at the bottom of the page for the Xerox benefits center).) However, these generic references to a toll-free number for the Xerox benefits center, again in pages of the SPD concerning other subjects, do not detract from the fact that the SPD specifically directed that requests for plan documents should be directed to the plan administrator at the Connecticut address. Even more fundamentally, because the record does not support any theory that the SPD misled Plaintiff or his counsel, the entire subject is not one on which Plaintiff can found liability on the evidentiary record assembled.

[5] Mr. Faraci was the only witness who testified at the hearing.

Ms. Glaser's letter provides an explanation for why Mr. Jacobs was not eligible for long-term disability benefits. (*Id.*) The evidence suggests that this letter was followed by a phone conversation on March 18, 2002, between Mr. Faraci and Ms. Glaser ("March 18, 2002 Conversation"). (Tr. at 15-16; Pl. Ex. 2; Pl. Ex. 3.)

On direct examination, Mr. Faraci could not specifically recall the contents of the conversation. Instead, as evidenced below in his testimony, his recollection was drawn from statements he wrote about the March 18, 2002 Conversation in his subsequent letters to Ms. Glaser:

> Q. Does showing you Plaintiff's Exhibit 3 refresh your recollection at all about any further contents of any conversation you may have had with Ms. Glaser on March 18, 2002?
>
> A. No, just what's in the letter. I don't – it was some – I know there was discussions about documents, but I don't – I don't have any real clear recollection of what we talked about.
>
> Q. Do you have any recollection of discussing with Ms. Glaser what her role or responsibility was with respect to the long-term disability?
>
> A. Well, it was my understanding that she was going to provide the documents.
>
> Q. And what was the basis of that understanding, if you had one?
>
> A. Their own letter. They're the one that told me that. I mean, I was told by their representative that she was the person that would supply me with the material. And she is a lawyer. I would have no reason not to believe that.
>
> Q. Did Ms. Glaser ever tell you that you needed to contact anybody else to get documents?
>
> A. No. The only – like I said, the only note here on the 18th talks about – I really can't. She wants some – oh, I see. Maybe she wants some language, statutory language, or something. I'm not sure what that note says. But I didn't – I didn't address it in the March 26 letter. I just – this would be my recollection of what we talked about. So obviously there were other conversations, but I don't recall

5

exactly what they were.

Q. Did Ms. Glaser make any representation to you about whether she would be able to provide you with any documents in relation to Mr. Jacobs applying for long-term disability?

A. Yeah, it's my understanding she was going to provide him. I mean, I sent her several follow-up letters asking her to do what she said she was going to do. But it never happened.

Q. What documents did you expect her to provide you with?

A. The plan documents, something that would explain his rights and benefits and so forth.

(Tr. at 15-17.)

On cross-examination, Defendant's counsel further explored the subject of the March 18,

2002 Conversation:

Q. Mr. Faraci, I believe you testified to one conversation with Hermina Glaser on March 18, at least that you can recall, is that correct?

A. Whatever I said. I don't recall if I said one or more. I am not sure. Whatever I said is what happened.

Q. Okay. Did she ever tell you that she was the plan administrator for the Xerox long-term disability plan?

A. I don't recall those words being used, but I assumed that I was dealing with the right person. That's all I can tell you.

Q. Did she make any representation to you about who the plan administrator was?

A. No, nobody ever told me that.

Q. No one ever told you who the plan administrator was?

A. No one ever told me that they were the wrong person.

Q. But no one ever – did you ever ask anyone who the plan –

6

A. The letters – the name I got came from their company. And they told me that this was the person that would be supplying the documents. And it's a lawyer for the company, and I assumed that I was dealing with the right person. Nobody ever told me that I was not dealing with the right person. So that's all I can tell you.

Q. But she told you she would provide the documents. You thought you were going to get the documents from her, and that's who you pursued getting the documents from, is that correct?

A. Yeah.

Q. Okay. But you had no notion that she was the plan administrator or wasn't the plan administrator?

A. Of course I had a notion she was. Why would I be asking her for the documents if I thought she wasn't the right person? Certainly I had a notion that she was.

Q. What was the basis for that.

A. Well, either she is a representative of Xerox Corporation. I'm writing to – asking for documents. She is corresponding back to me. She is calling me. She's telling me she's going to give me these documents. I got to assume that either she is the plan administrator or she is the lawyer for the plan administrator. Or what am I doing? Talking to nobody? It doesn't make sense to assume that it's anything different than that.

Q. And yet on November 5 you wrote a letter requesting plan documents addressed to Brookfield and addressed to the attention of the administrator of Xerox's long-term --

A. Yes.

Q. -- disability plan.

A. That's true.

Q. Okay. Did you have any reason to think that the administrator's offices were in Brookfield?

A. I had no reason to think that they were not in Brookfield.

7

Q. Did you have any reason to think they were?

A. Yes, because people have been talking to me and writing to me, telling me they were going to send me documents. I would assume they are coming from the office that – what I'm writing – what I'm asking for.

Q. You assumed someone was going to send you the plan documents?

A. Yes, absolutely.

Q. But you didn't know who that person was or whether they were the plan administrator?

A. My understanding is, Ms. Glaser was the lawyer representing them. You know, if she wasn't, she could have told me that. She didn't – she certainly didn't tell me that in any letter or any conversation that I've got noted in my file.

Q. But you had one conversation with her. She said she'd send documents to you, and you never received the documents from her –

A. Yes.

(*Id.* at 24-26; *see also id.* at 31 (Mr. Faraci responding that he did not remember Ms. Glaser

stating that she represented the plan administrator).)

Mr. Faraci then sent a letter to Ms. Glaser on March 26, 2002 ("March 26, 2002 Letter").

(Pl. Ex. 3.) The letter states:

In conjunction with our telephone conversation of March 18, 2002, this letter will confirm that you will forward to me all of the documents which contain the language entitling my client to both short and long term group disability with your company. These are plans which do not include Prudential. If an actual policy has been issued to my client then I would like to see the copy of the policy issued to him.

(*Id.*)

Mr. Faraci sent two additional letters to Ms. Glaser, dated April 10, 2002, and May 8,

2002 ("April 10, 2002 Letter" and "May 8, 2002 Letter"). (Pl. Exs. 4, 5.) The April 10, 2002

8

Letter references the March 18, 2002 conversation and requests "a copy of the short term and long term disability policy." (Pl. Ex. 4; Tr. at 17.) Mr. Faraci's copy of the April 10, 2002 Letter also contains a handwritten notation stating that Mr. Faraci left word for Ms. Glaser to call him on May 7, 2002. (Pl. Ex. 4; Tr. at 18.)

The May 8, 2002 Letter states that "[o]n March 18, 2002, you advised that you would be forwarding the documentation with regards to David Jacobs' short term and long term disability benefits. As of this date, I have not received those documents from you. Please provide them as soon as possible." (Pl. Ex. 5; *see also* Tr. at 18.) Mr. Faraci's May 8, 2002 Letter was faxed on May 9. (Pl. Ex. 5; Tr. at 19.)

The record does not indicate that Mr. Faraci received any written responses to his March 26, April 10, or May 8, 2002 Letters. Nor does the correspondence between the parties suggest that Mr. Faraci and Ms. Glaser spoke on the phone after the March 18, 2002 conversation; Mr. Faraci also did not have specific recollections of any subsequent phone calls.

The next letter introduced into evidence by Plaintiff is a letter from Mr. Faraci dated November 5, 2002 ("November 5, 2002 Letter"). (Pl. Ex. 6; Tr. at 20.) The letter is addressed to the Xerox Corporation, 400 South Executive Drive, Brookfield, Wisconsin, 53005, and is sent to the attention of the "Administrator of Xerox's Long Term Disability Plan." (Pl. Ex. 6.) Mr. Faraci copied Ms. Rogowski, Ms. Glaser, Mr. Jacobs, and Mr. Craig Penrose (another attorney consulted by Mr. Faraci with respect to Mr. Jacobs's case (Tr. at 22)) on the letter. (*Id.*) The November 5, 2002 Letter states in relevant part:

> Accordingly, please consider this a Formal Request under Section 104 of ERISA, 29 U.S.C. § 1024, for a copy of the long term disability plan for employees of Xerox that would have been in effect for the period prior to January

2001 to the present. Please consider this request for both the complete plan document, summary plan description, and any contract for insurance if the plan is insured, reinsured or has "stopgap" coverage for an insurance company.

As you are well aware, failure to provide this information is a violation of ERISA and may be redressed in the courts. We look forward to your compliance with this request and agree to pay any reasonable copy costs.

(*Id.*) Mr. Faraci sent the November 5, 2002 Letter by certified mail, with return receipt requested. (*Id*; Tr. at 20.) The receipt indicates that the letter was delivered to the Xerox-Brookfield address and was signed for by "A. Bouge" on November 12, 2002. (Pl. Ex. 6; Tr. at 20, 22-24.) Mr. Faraci testified that he was uncertain where he got the Brookfield address to send a letter to the plan administrator, although he thought it was possible that he got the address from Ms. Glaser or Ms. Rogowski. (Tr. at 20-21.) Mr. Faraci did not receive any letters, documents or telephone calls in response to the November 5, 2002 Letter. (*Id.* at 21; Pl. Ex. 6 (handwritten notation dated 1/07/03, apparently made by Mr. Faraci, describing conversation with Mr. Jacobs where Mr. Faraci told him that he had not received an answer to the November 5, 2002 Letter).)

Mr. Faraci's representation of Mr. Jacobs apparently ended at some point after November 5, 2002. (Tr. at 21.) Mr. Jacobs subsequently retained the law firm of Daley, DeBofsky & Bryant. On April 4, 2003, Mr. DeBofsky mailed a letter by certified mail to Mr. Lawrence Becker, the Plan Administrator, to Xerox Corporation, 800 Long Road, P.O. Box 1600, Stamford, Connecticut, 06904 ("April 4, 2003 Letter"). (D.E. 13, Attachment 1, 0001-0009; Tr. at 35.) As stated above, this is the address listed for the Plan Administrator in the SPD. (Def. Ex. A at 146.) This letter stated:

Please be advised that we represent David Jacobs, a former employee of Xerox

10

Corporation. Due to a difficulty in determining the proper agent for service for the Xerox Corporation Long Term Disability Plan, we have only just been advised to contact you. Enclosed, please find correspondence between this office and Thompson Coburn, correspondence between Xerox and previous counsel, as well as insurance and medical records regarding Mr. Jacobs.

Please consider this letter a claim for benefits under the plan. I would appreciate it if you would forward all of the aforementioned documents to the appropriate person at Xerox so that Mr. Jacobs may perfect his claim for long-term disability benefits. I would also appreciate it if you would respond to this letter and provide the name of the proper individual to expedite the claim process.

(D.E. 13, Attachment 1 at 0001.) Attached to the April 4, 2003 Letter was, *inter alia*, Mr.

Faraci's March 5, 2002 Letter to Ms. Rogowski, Ms. Glaser's March 12, 2002 Letter, and Mr.

Faraci's March 26, 2002, and May 8, 2002 Letters. (*Id.* at 0005-0009.) The parties have

stipulated that the plan documents were mailed to Mr. DeBofsky on May 27, 2003, and received

on May 28, 2003. (Tr. at 37.) Plaintiff then applied for and was denied long-term disability

benefits. (*See* D.E. 58 at 6.) He disputed the denial by appealing to the Plan Administrator on

August 1, 2003. (*See id.*) Ultimately, the Plan Administrator denied the appeal for benefits.

(*See id.*)

On May 23, 2003, Plaintiff filed suit against the Plan. (D.E. 1.) He filed his Second

Amended Complaint on September 29, 2003. (D.E. 10.) The Court issued an opinion on

January 19, 2005, affirming the Plan Administrator's denial of long-term benefits, as well as the

denial of Plaintiff's claim under Section 510. (D.E. 58.) Having held an evidentiary hearing and

having reviewed the parties' briefing on Plaintiff's remaining Section 1132(c) claim, the Court is

now prepared to enter judgment and does so in favor of the Defendant Plan.

11

II.     Legal Standard

Section 1024(b) of ERISA provides, in relevant part: "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, . . . or other instruments upon which the plan is established or operated . . . ." 29 U.S.C. § 1024(b)(4) (2006); accord, e.g., Anderson v. Flexel, Inc., 47 F.3d 243, 248 (7th Cir. 1995) (quoting 29 U.S.C. § 1024(b)(4)). A request for documents under Section 1024(b)(4) necessitates a response from the plan administrator "when it gives the administrator clear notice of what information the beneficiary desires." Anderson, 47 F.3d at 248 (collecting cases); see also id. (explaining that the assessment of the clarity of the request is reviewed "under a clearly erroneous standard.") (collecting cases).

Section 1132(c)(1) of ERISA sets a thirty-day deadline for plan administrators to respond to requests for information submitted under, inter alia, Section 1024(b)(4). Section 1132(c)(1) also allows courts the discretion to impose up to a $110 a day penalty on plan administrators who fail or refuse to comply with such a request for information. See 29 U.S.C. § 1132(c)(1) (2006); 29 C.F.R. § 2575.502(c)-1.[6] The purpose of Section 1132(c)(1) of ERISA "is not so much to

_____

[6] Specifically, § 1132(c)(1) provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested to the last known address of the requesting participant of beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to . . . [$110] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502(c)-1 (emphases added).

12

penalize as it is to induce plan administrators to comply with the notice requirements" and a participant's request for information. *Leo v. Laidlaw, Inc.*, 38 F. Supp. 2d 675, 679 (N.D. Ill. 1999) (citing *Winchester v. Pension Comm. of Michael Reese Health Plan, Inc.*, 942 F.2d 1190, 1193 (7th Cir. 1991)); *see also Romero v. Smithkline Beecham*, 309 F.3d 113, 119 (3d Cir. 2002) (Alito, J.) (holding that "section 502(c)(1) requires actual receipt by the administrator"). Whether or not sanctions are ultimately awarded is a matter, as the statute says, in the trial court's discretion. *See* 29 U.S.C. § 1132(c)(1); *see also Harsch v. Eisenberg*, 956 F.2d 651, 662 (7th Cir. 1992) (holding that, "the fact that the district court may award statutory penalties even when there is no provable injury by no means suggests that the court may not *deny* penalties when there *is* injury") (emphases in original). When exercising its discretion, a district court may, but is not required to, consider whether the failure to provide documentation prejudiced the plan beneficiary. *See, e.g., id.* (citation omitted). Other factors that the court may consider include whether there was "bad faith or intentional conduct on the part of the administrator," "the length of the delay," and "the number of requests made and documents withheld . . . ." *Romero*, 309 F.3d at 120 (internal quotation marks and citation omitted); *accord Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 90 (2d Cir. 2001).

III.   Plaintiff Has Failed to Establish Liability of the Defendant Plan

      A.   With Limited Exceptions, Section 1132(c) Liability May Only Stand Against The Plan Administrator

Defendant argues generally that liability under Section 1132(c) may not stand in the present matter, because Plaintiff only has sued the ERISA Plan, and Section 1132(c) "permits a court to impose liability only on the plan administrator (or in limited circumstances, someone

estopped from denying she is the plan administrator)." (D.E. 76 at 9.) ERISA's statutory language and case law applying the statute support Defendant's position. This is quite significant in the instant case, because Plaintiff has sued only the ERISA Plan, not the Administrator of the Plan. *Compare* 29 U.S.C. 1132(c) (Any administrator . . . who fails or refuses to comply with a request for any information . . . within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to . . . [$110] a day . . . .).

The language of Section 1132(c) refers only to the plan administrator and speaks in terms of personal liability against the administrator. It does not, by contrast, suggest that any liability may lie against the ERISA plan or plan assets—which assets, one might reasonably infer, are thereby safeguarded by Congress for use as benefits to sick or disabled beneficiaries, as opposed to being available to pay for the oversights or misdeeds of the plan administrator. Precedent teaches that where the language of a statute is clear—as it is here in placing liability (indeed personal liability) on the plan administrator, with no suggestion that a claim may be advanced against the assets of the ERISA plan—courts typically should apply the statutory directive. *See, e.g.*, *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'") (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *Gillespie v. Equifax Information Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007) ("When interpreting statutes, we give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent") (internal quotation marks and citations omitted). To be sure, precedent further directs that textual directives are not absolutes—there might be an absurd result, or legislative history might

14

compellingly suggest an interpretive outcome, *see, e.g., id.*—but in this case Plaintiff has cited no legislative history in support of departing from the statutory text. Similarly, there is nothing absurd, illogical, or unworkable about a statutory regime that seeks to incentivize plan administrators to respond quickly by exposing them to potential personal liability, as opposed to a system in which plan assets otherwise available to pay benefits to sick or disabled people may be diverted to pay for the putative nonfeasance or misfeasance of plan administrators concerning document requests.

In addition, other ERISA statutory language argues against finding that the terms "plan" and "administrator" are interchangeable in ERISA provisions. In this regard, it is important at the outset to appreciate that ERISA is a comprehensive and finely-tuned statute, concerning which Congress has spent enormous amounts of time and attention. Thus, in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court collected extensive precedent and wrote:

> We have observed repeatedly that ERISA is a "'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Associates* 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corporation*, 446 U.S. 359, 361 (1980)). We have therefore been especially "reluctant to tamper with [the] enforcement scheme" embodied in the statute by extending remedies not specifically authorized by its text. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985). Indeed, we have noted that ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens, supra*, at 254 (quoting *Russell, supra*, at 146-47).

*Id.* at 209 (emphasis in all prior Supreme Court opinions).

In defining the term "administrator," ERISA states that:

The term administrator means–(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is

not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A). ERISA's definition of the term "administrator" does not suggest that the administrator and the plan should be equated. Indeed, even if no administrator is named in the plan documents,[7] the plan does not become its own default administrator; instead, the employer/sponsor assumes that role. *Id.* Furthermore, substantial precedent confirms that the terms "administrator" and "plan" are distinct concepts under ERISA. *See Groves v. Modified Retirement Plan*, 803 F.2d 109, 116 (3d Cir. 1986) ("We conclude . . . that the terms 'plan' and 'plan administrator' refer to two entirely distinct actors. The words 'plan administrator' and 'employee benefit plan' are terms of art under ERISA. Both are given specific meanings by ERISA's definition section. While 'plan' refers to a variety of 'plans,' 'funds,' or 'programs,' 'plan administrator' is defined, with exceptions not relevant here, as 'the person specifically so designated by the terms of the instrument under which the plan is operated.'") (internal citations and brackets omitted); *accord, e.g., Thorpe v. Retirement Plan of the Pillsbury Co.*, 80 F.3d 439, 444 (10th Cir. 1996) ("ERISA defines 'administrator' as 'the person specifically so designated by the terms of the instrument under which the plan is operated.'") (citing 29 U.S.C. § 1002(16)(A)(i)).

In addition, further applicable precedent favors Defendant's position that the administrator is the only party against whom the statutory penalties under Section 1132(c) may be assessed. *See, e.g., Van Hoey v. Baxter Int'l, Inc.*, No. 96 C 6231, 1997 WL 665855, at *7

---

[7] In the plan at issue in this case, there was a named administrator, who is presently Mr. Becker, a non-party to the present suit.

16

(N.D. Ill. Oct. 21, 1997) (Zagel, J.) (discussing the plaintiff's claim for civil penalties based on, *inter alia*, violations of Section 1024(b) and stating that "[t]he Seventh Circuit has interpreted these provisions to mean that a cause of action for violations of ERISA's disclosure requirements is proper only against the plan administrator") (citing *Klosterman v. Western Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994)); *accord Hiney Printing Co. v. Brantner*, 243 F.3d 956, 961 (6th Cir. 2001) ("The law in this Circuit is clear that '[o]nly a plan administrator can be held liable under section 1132(c).'") (quoting *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 617 (6th Cir. 1992)); *Cline v. The Indus. Maint. Eng'g & Contracting Co., et al.*, 200 F.3d 1223, 1234 (9th Cir. 2000) ("Under 29 U.S.C. 1132(c), only the plan 'administrator' can be held liable for failing to comply with the reporting and disclosure requirements.") (citing *Moran v. Aetna Life Ins. Co.* 872 F.2d 296, 299 (9th Cir. 1989)); *Thorpe*, 80 F.3d at 444 (affirming dismissal of ERISA plan as a defendant to a Section 1132(c) claim and stating that "[s]uch causes of action may be brought only against designated plan administrators, rather than the plan itself . . . .").

Before moving any further, the Court must underscore that Plaintiff never sued the Administrator of the Plan—*i.e.*, the person upon whom the statute actually imposes responsibility for providing documents upon request and the person who can be held accountable, if appropriate under the equities of a particular case, through the imposition of personal liability in an amount up to $110/day for failure to provide such documents. Plaintiff only sued (and went to trial against) the "Xerox Corporation Long Term Disability Income Plan." As discussed later, over a year after the hearing/bench trial on the Section 1132(c) claim, after extensive post-hearing briefing had been tendered, Plaintiff filed a belated request to amend the pleadings so as to add

17

new parties (including, in particular, Mr. Becker, the plan administrator). That motion for leave to amend has been denied, for reasons set forth in full at the end of the opinion; however, for present purposes, the Court addresses the claim as it was framed and tried—*i.e.*, as a claim against the Xerox Corporation Long Term Disability Income Plan.[8]

Because the statute does not allow for the imposition of liability against the plan, Plaintiff's claim appears doomed. Nonetheless, the Court proceeds to consider whether any exceptions to the general rule limiting liability to the administrator justify penalizing the Plan under Section 1132(c).

B.     Plaintiff Has Failed to Show that Xerox is the Alter Ego of the Plan

Plaintiff argues that the Plan should be "estopped" from denying liability for Ms. Glaser's putative failure to respond to the requests for documents because "the Plan and Xerox

---

[8] As Defendant acknowledged in its briefing, *Lowe v. McGraw-Hill Companies, Inc.*, 361 F.3d 335 (7th Cir. 2004), affirmed a lower court judgment in which Judge Conlon seemingly imposed penalties for failure to timely produce ERISA plan documents on an ERISA plan and its administrator as opposed to the plan administrator alone. Nonetheless, the question of whether such penalties could be imposed as against the plan, as opposed to just the plan administrator, does not appear to have been litigated in the Seventh Circuit, in the district court (where proceedings involved a threshold default of the defendants who failed to timely answer or otherwise appear), or before the magistrate judge, who adjudicated most of the damages issues before issuing a report and recommendation which was then adopted by Judge Conlon. *See id.*; *Lowe v. SRA/IBM MacMillan Pension Plan, et al.*, No. 01 C 58, 2003 WL 1565841 (N.D. Ill. Mar. 25, 2003) (adopting report and recommendation of magistrate judge); *Lowe v. SRA/IBM MacMillan Pension Plan, et al.*, No. 01 C 58 (N.D. Ill), D.E. 64 (12/11/02 report and recommendation of Magistrate Judge Denlow following entry of default on liability by Judge Conlon). Because the issue of whether penalties could properly be imposed under 29 U.S.C. § 1132(c) against the ERISA plan was not litigated, precedent teaches that the resolution in *Lowe* should not be understood as a *sub silentio* affirmation of that idea. *See, e.g.*, *Cooper Industries, Inc. v. Availl Services, Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not be considered as having been so decided as to constitute precedents.'") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

18

Corporation acted as alter egos of one another." (D.E. 74 at 4.) The Court respectfully rejects Plaintiff's alter ego argument.

First, as explained above, the ERISA statute provides for potential liability as against the plan *administrator*, and expressly states that the administrator can be "personally liable," at the district court's discretion, for penalties of up to $110/day. 29 U.S.C. 1132(c). As a result, Plaintiff's proposed showing—that "Xerox," the plan sponsor, should be equated with the Plan, the named Defendant—would seem, with all respect, to be beside the point, in that neither of the two is the appropriate potential defendant, the plan administrator. The various defined roles in the ERISA scheme—administrator, plan, sponsor—are important, and showing that a sponsor should be collapsed into the plan, itself a significant step, still would not establish that either of those entities are the administrator of the plan.[9]

---

[9] Plaintiff cites *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*, 378 F.3d 669 (7th Cir. 2004), and *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482 (7th Cir. 1996), which state that *health and welfare benefits claims* should be advanced against a plan, not an employer, claims processor, or plan administrator. *See, e.g., Blickenstaff*, 378 F.3d at 674 ("On its face, the complaint asserted only a § 502(a)(1)(B) claim for benefits, which generally is limited to a suit against the Plan, not an employer . . . or the claims evaluator.") (citing, *inter alia, Jass*, 88 F.3d at 1490). These cases flow from 29 U.S.C. § 1132(d)(2), which states that, "[a]ny money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter."). The relevant provision of ERISA at issue here, 29 U.S.C. § 1132(c)(1), however, specifically provides for just such putative individual liability as against the plan administrator: "*Any administrator* . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . within 30 days after such request *may in the court's discretion be personally liable to such participant or beneficiary* in the amount of up to . . . [$110] a day . . . ." 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502(c)-1 (emphases added); *accord, e.g., Van Hoey v. Baxter Int'l, Inc.*, No. 96 C 6231, 1997 WL 665855, at *7 (N.D. Ill. Oct. 21, 1997) (Zagel, J.) (stating that "[t]he Seventh Circuit has interpreted these provisions to mean that a cause of action for violations of ERISA's disclosure requirements is proper only against the plan administrator.") (citing *Klosterman v. Western Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994)); *accord Hiney Printing Co. v.*

19

Moreover, and independently, even if that foundational problem did not exist, Plaintiff has not established on the record assembled that Xerox is the "alter ego" of the Plan. In this regard, the Court notes that the case was not tried as an "alter ego" or veil-piercing sort of case, and the "alter ego" theory—with all respect—seems like a belated attempt to salvage an ill-framed claim.

Plaintiff cites precedent teaching that "'the purpose underlying the alter ego doctrine in the ERISA context is to prevent a corporate business from limiting its . . . responsibilities by fractionalizing its business operations.'" (D.E. 74 at 5 (quoting *Chicago District Council of Carpenters Pension Fund v. Sunshine Carpet Servs., Inc.*, 866 F. Supp. 1113, 1115 (N.D. Ill. 1994) (Norgle, J.) (collecting Seventh Circuit authorities).) In this case, however, there is no evidence that Xerox has "fractionalized its business operations" to frustrate Mr. Jacobs–either as to health benefits or to impede his ability to request documents of the plan administrator. Plaintiff also cites to *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 461 (7th Cir. 1991), in which the Seventh Circuit recognized three factors for determining whether the Court should disregard the corporate entity and apply the alter ego doctrine: 1) the amount of respect which the shareholders give to the separate entity; 2) the fraudulent intent involved; and 3) the amount of injustice which the parties would suffer by respecting the corporate entity. *Id.*; *accord, e.g., Bd. of Trustees of the Chicago Plastering Inst. Pension Trust Fund v. W.A. Duguid*, 761 F. Supp.

*Brantner*, 243 F.3d 956, 961 (6th Cir. 2001) ("The law in this Circuit is clear that [o]nly a plan administrator can be held liable under section 1132(c).") (internal quotation marks and citation omitted); *Cline v. The Indus. Maint. Eng'g & Contracting Co., et al.* 200 F.3d 1223, 1234 (9th Cir. 2000) ("Under 29 U.S.C. 1132(c), only the plan 'administrator' can be held liable for failing to comply with the reporting and disclosure requirements.") (citation omitted). As a result, nothing in ERISA precluded Plaintiff from properly proceeding to trial against the administrator.

1345, 1348 (N.D. Ill. 1991) ("Alter egos generally are found where two enterprises share substantially identical management, business purpose, operation, equipment, customers, and supervision as well as ownership.") (internal quotation marks and citation omitted). Of the three factors, the Seventh Circuit affords the greatest weight to the second factor, *i.e.*, whether there was fraudulent intent by the shareholders in setting up or in operating the second corporate entity. See *Chicago District Council of Carpenters Pension Fund*, 866 F. Supp. at 1116 (citation omitted).

Plaintiff supports his argument that the Plan and Xerox are alter egos in the following way: "[t]he Plan exists to serve the interests of Xerox Corporation; while Plaintiff was unable to present evidence that the two entities share a common workspace or commingle assets, the funding for the Plan is provided by Xerox Corporation, including general assets. Plan §9.1 at 19. Moreover, both entities share a common goal, which is to further the best interests of Xerox Corporation." (D.E. 74 at 5-6.) The Court is, with all respect, unpersuaded by Plaintiff's alter ego argument as advanced. Plaintiff has conceded that the two entities do not share a common workspace or commingle assets; in addition to these conceded points, there is also no evidence that the entities share management, a common business purpose (setting aside Plaintiff's unsupported and generically conclusory assertion that the entities "share a common goal, which is to further the best interests of Xerox Corporation"[10]), equipment, or customers. *See, e.g.*,

---

[10] At the risk of stating the obvious, corporations do not typically create entities with any purpose other than promoting the general interests of the corporate family, at least in some form or fashion. If the fact that an entity or subsidiary related to a corporation was created with the general purpose of trying to promote the best interests of the corporation were enough to warrant veil-piercing, the viability of the corporate form—upon which numerous fundamental legal relationships concerning, for example, tax law, creditors' rights, *etc.*, are founded—would be severely compromised, if not rendered non-existent.

*Chicago Plastering Inst. Pension Trust Fund*, 761 F. Supp. at 1348. Moreover, Plaintiff has not argued, nor could he on any principled basis, that the Plan was set up or operated with any kind of fraudulent intent, as was found to be crucial in *Lumpkin*. *See id.*, 933 F.2d at 461 (stating that there should be disregard of the corporate entity if "potential fraud [would be] nullified").

Plaintiff has two pieces of evidence that he relies on in support of his alter ego assertion. First, he notes that Xerox funds the Plan. (D.E. 74 at 5.) However, this evidence, on its own, is not persuasive; many ERISA plans are funded by the employer/sponsor, and the mere fact of funding has not been found sufficient to disregard the separate status of an ERISA plan. Second, Plaintiff asserts in its reply brief that the connection between Xerox and the Plan "is illustrated by the language in the SPD that directs plan participants to Xerox Corporation's human resources department with questions regarding benefits under the Plan." (D.E. 79 at 7-8.) Plaintiff does not explain how this evidence relates to the alter ego analysis. Generously construed, the statement in the SPD suggests some minor overlap in operations between the two entities. It does not bear on other relevant factors for the application *vel non* of alter ego, in particular the significance that there be at least *some* meaningful showing of fraudulent intent.[11]

---

[11] Plaintiff cites language from *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449 (7th Cir. 1991), which states that, "[t]he underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits." *Id.* at 461. The Court has no quarrel with this principle; however, it is inapposite to the case at hand. As *Lumpkin* explained, "the *alter ego* doctrine applies to the plaintiffs' theory of the case," because they "ha[d] alleged control, fraud, and undercapitalization by defendant in order to pierce the corporate veil," and therefore a Rule 12(b)(6) dismissal of the claim based on a corporate form defense was inapposite. *Id.* at 460. Here, *after* discovery has been completed and a trial has been held, there is not even a colorable allegation of fraud, undercapitalization, control, or intermingling of affairs. Nor is there any evidence that Xerox has contrived to create corporate subsidiaries or other entities that are hollow shells that will not be able to pay for insureds' health and disability benefits, where warranted.

22

Therefore, the Court finds that Plaintiff's *alter ego* argument fails for multiple reasons. The Court accordingly declines to find on this basis that the Plan should be liable for failings related to Section 1132(c) disclosure.

      C.      Estoppel Does Not Apply On the Record Assembled

Plaintiff asserts that the Plan should be estopped from denying liability under Section 1132(c). (*See, e.g.*, D.E. 74 at 1.) The Court concludes that Plaintiff has failed to establish the necessary elements for estoppel on the evidentiary record assembled.

The Seventh Circuit has held that estoppel may be applied in certain ERISA actions. *See Gallegos v. Mt. Sinai Medical Center*, 210 F.3d 803, 809 (7th Cir. 2000) (collecting cases and discussing the considerations to be weighed in deciding whether to apply estoppel). Precedent teaches that ERISA estoppel claims require a plaintiff to show "(1) a knowing misrepresentation by the defendants; (2) in writing; (3) with reasonable reliance by the plaintiff on the misrepresentation; and (4) to the plaintiff's detriment." *Davis v. Combes*, 294 F.3d 931, 939 (7th Cir. 2002) (citing *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000)). The applicability of estoppel to Section 1132(c) claims was addressed by the Seventh Circuit in *Jones v. UOP*, 16 F.3d 141 (7th Cir. 1994). The Section 1132(c) claim in *Jones* was based upon an untimely response to plaintiff's counsel's requests for plan documents; the document requests were not sent to the plan administrator designated in the plan's SPD, but instead to the employer's (*i.e.*, the plan sponsor's) legal and personnel departments. *Id.* at 144. *Jones* concluded that statutory liability under Section 1132(c) should not apply, stating that "if a plan administrator is designated in the plan instrument, that is who has the statutory duty to respond to requests for information in a timely fashion under threat of monetary penalty." *Id.*

Although the Seventh Circuit held that, when a plan administrator is designated in the plan instrument, Section 1132(c) imposed statutory duties (and potential liability) on that plan administrator rather than on the employers/plan sponsor, Judge Posner, writing for the court, went on to describe a potential scenario "in which the plan sponsor would be estopped to deny that it was the administrator . . . ." *Id.* The hypothetical scenario was described as "[i]f . . . [the employer's] legal department had told . . . [plaintiff's] lawyer to forget about . . . [the administrator] and direct all his document requests to the legal department, and if in reliance on this advice the lawyer had foregone an opportunity to obtain the documents from the plan administrator and . . . [plaintiff] had suffered a harm as a result, the elements of estoppel would be present." *Id.* (citing *Thomason v. Aetna Life Ins.*, 9 F.3d 645, 648 (7th Cir. 1993)).

Therefore, the Court considers whether Plaintiff has shown that Defendant, the Xerox Corporation Long Term Disability Income Plan, should be "estopped" from denying that it is the plan administrator and should be held liable under Section 1132(c). This proposition is seemingly a non-starter, as the ERISA Plan is a juridical entity that seemingly cannot make misrepresentations of that sort. Even if one elides past that issue, and analyzes whether Xerox Corporation should somehow be estopped from denying that it is the plan administrator, the Court concludes that Plaintiff has failed to show all of the necessary elements of estoppel, as delineated in *Jones* and other ERISA cases, as explained below. The Court accordingly rejects Plaintiff's estoppel argument.

The first element of estoppel is a knowing misrepresentation. The Court will assume *arguendo* that Ms. Glaser made a misrepresentation when she allegedly told Mr. Faraci in the March 18, 2002 Conversation that she would send him all of the Plan documents and when she

24

"never directed Mr. Faraci to a different party." (D.E. 74 at 3-4.) Because Ms. Glaser did not subsequently send Mr. Faraci the plan documents, Ms. Glaser's statement to Mr. Faraci will be treated for present purposes as a putative misrepresentation sufficient for the first element of estoppel.

However—and the Court will discuss this further—the Court does not find that the evidence shows that Ms. Glaser misrepresented that she was the Plan Administrator, or, as was described by Judge Posner in *Jones*, that she told Mr. Faraci to "forget about" the plan administrator and to "direct all his document requests" to her. *See id.*, 16 F.3d at 144. Mr. Faraci remembers very little of the March 18, 2002 Conversations—his testimony at the hearing was drawn from his subsequent letters. (Tr. at 15.) Mr. Faraci's letters of March 26, April 10, and May 8, 2002 do not in any way indicate or even suggest that Ms. Glaser told Mr. Faraci that she was the Plan Administrator or that he should only correspond with her regarding the Plan documents. (Pl. Exs. 3-5.) Moreover, Mr. Faraci specifically testified that he did not remember Ms. Glaser stating that she represented the Plan Administrator. (Tr. at 30.) Therefore, the Court concludes that the only potential misrepresentation at issue was that Ms. Glaser would forward along the Plan documents.

The fact that Ms. Glaser's putative misrepresentation was made orally would appear to run afoul of the second requirement of the ERISA estoppel doctrine, namely that the misrepresentation be in writing. *See, e.g., Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999) (reviewing the law governing estoppel claims under ERISA and collecting a number of cases that "have held that the estoppel doctrine does not override the rule forbidding oral modifications to an ERISA plan."). However, the Seventh Circuit carved out an exception

25

in *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 588 (7th Cir. 2000), which permits oral misrepresentations to be a basis for ERISA estoppel where, 1) the ERISA plan was ambiguous, and 2) an agent of the plan or someone with apparent authority to interpret the plan made the oral misrepresentation. *See Kamler v. H/N Telecommunication Servs., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) (describing the exception defined in *Bowerman* and concluding that it did not apply in the case at hand).

The Court first considers whether the SPD's language could reasonably lead Plaintiff's counsel to rely on Ms. Glaser's representation that she would send him the Plan documents. (*See* D.E. 74 at 4 (stating that "Mr. Faraci acted in accordance with the benefit plan's summary plan description by contacting Xerox's human resources department. Mr. Faraci was then directed to an attorney, Ms. Glaser . . . ."); *see also* D.E. 79 at 4 ("Estoppel arises not only from reliance on Ms. Glaser's assertions, but also from the language in the SPD.").) The first problem for Plaintiff in this regard, however, is that Mr. Faraci made very clear that he did not rely on any supposed ambiguity in the SPD about who to contact with document requests. *See* note 4 (collecting testimony of Mr. Faraci), *supra*. Second, and independently, the argument that the SPD is ambiguous about where to direct requests for ERISA plan documents is itself most strained. The SPD specifically advises plan participants of their right to "[o]btain copies of all plan documents and other plan information as required by ERISA upon written request to the Plan Administrator." (Def. Ex. A. (SPD) at 144; Tr. at 30.) The SPD also states that "the plan administrator for each ERISA governed welfare plan described in this book" can be reached at a specific address and phone number in Stamford, Connecticut. (Def. Ex. A at 146; Tr. at 30-31.) There is no reference to Xerox's human resources department anywhere in the Administrative

26

Information section of the SPD that addresses where and how ERISA documents may be obtained.

To be sure, there are, in other sections of the SPD (which typically deal with very different subjects), references to an "800" number for the "Xerox Benefits Center," as well as a generic statement that participants can "[a]sk their Human Resources representative for information" about LTD Disability Coverage. (Def. Ex. A at 97.) However, even putting aside the fact that there is no evidence whatsoever that Mr. Faraci or Plaintiff relied upon these statements in the SPD, they still do not detract from the clarity of the specific directives in the SPD, in the section addressing requests for plan documents, that such requests should be made to the plan administrator at the Stamford, Connecticut address. Moreover, in this regard, the table of contents of the SPD clearly indicates where to look for information about plan documents. (*See* Def. Ex. A, SPD Table of Contents at 2).

Furthermore, looking beyond the language of the SPD to the conduct of Ms. Glaser, the evidence does not clearly support a finding of reasonable reliance. The facts in the present matter fall short of the extreme described in the estoppel hypothetical described in *Jones*. *Jones*, 16 F.3d at 144. The evidence presented at hearing did not show that Ms. Glaser represented herself to be the Plan Administrator, or to be counsel to the Plan Administrator, or to be the agent of the Plan Administrator, much less that she represented that Mr. Faraci should "forget about . . . [the Plan Administrator] and direct all his document requests to the legal department." *See id.*, 16 F.3d at 144; *accord, e.g., id.* at 145 ("If the plan designates an administrator and the sponsor *makes no effort to impede participants' access to him*, we cannot see what purpose would be served by the imposition of statutory penalties.") (emphasis added); *Van Hoey v. Baxter Int'l,*

27

*Inc.*, No. 96 C 6231, 1997 WL 665855, *7 (N.D. Ill. Oct. 21, 1997) (Zagel, J.) ("When a plan designates a plan administrator, document requests must be addressed to that entity and requests addressed to the employer's legal department will not trigger civil penalties.") (citing *Jones*, 16 F.3d at 144).[12]

Finally in this regard, and entirely independently, Plaintiff's estoppel claim falls short because Plaintiff has failed to show the final, necessary element of detriment. As already discussed, the Seventh Circuit in *Jones* described a scenario in which the plan sponsor would be estopped from denying that it was the *de facto* plan administrator, and so could be exposed to liability under Section 1132(c). (Again, Plaintiff here never sued the plan sponsor, Xerox Corporation, nor proceeded to trial against it.) The final piece of the hypothetical puzzle in *Jones*

---

[12] At times Plaintiff appears to suggest that the ERISA plan or plan administrator created an apparent agency relationship vis-a-vis the human resources department at Xerox, such that agency principles would warrant the imposition of liability against the Defendant ERISA Plan. This contention is unpersuasive. The supposed factual predicate for this idea is that the SPD misled Mr. Faraci, Plaintiff's former counsel, into believing that the human resources department at Xerox was the agent of the plan or administrator. However, Mr. Faraci repeatedly and plainly acknowledged that he had not seen the SPD during the relevant time periods, and thus was not misled by it. *See* note 4, *supra*. Plaintiff offers no further evidence in support of his apparent agency claim vis-a-vis the named Defendant, the ERISA Plan, or the Plan Administrator, the party potentially accountable under Section 1132(c). In this regard, it is well-settled that a showing of apparent agency must be grounded in the words and actions of the putative principal, not those of the putative agent. *See Sphere Drake Ins., Ltd. v. American Gen'l Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004); *accord Crull v. Sunderman* 384 F.3d 453, 467 (7th Cir. 2004); Restatement (Third) of Agency § 2.03 (2006). Because the Plan, the named Defendant, did not create an apparent agency, nor did the Administrator, the apparent agency theory fails on the record assembled. Moreover, because Plaintiff offered no evidence that Mr. Faraci or Plaintiff was misled by any supposedly ambiguous statements in the SPD about the role of the Xerox human resources department (and this contention is a strained one from the beginning, given that the SPD directly explained that documents could be requested from the plan administrator and provided an address and phone number in Stamford, Connecticut for the administrator), any suggestions by Plaintiff that the ERISA Plan cloaked the human resources department with apparent authority are also respectfully rejected on the evidentiary record assembled.

28

was that the plaintiff must have "suffered harm as a result" of his or her reliance on the misrepresentations. *See id.*, 16 F.3d at 144; *accord, e.g., id.* at 145 (noting that the elements of estoppel had not been established in the actual case, as opposed to the hypothetical, because, *inter alia,* "there was no detriment . . . [in that plaintiff] was unable to show any harm from the delays in responding to his various requests."). The Seventh Circuit stressed in *Jones* that Section 1132(c) "is plain and severe and ought not to be stretched beyond what is possible with the use of familiar, clear, tested, administrable doctrines-such as equitable estoppel-for preventing the evasion of legal duties." *Id.* The law of estoppel in the Seventh Circuit, as described in *Jones* and as applied in other ERISA cases, requires that the party asserting it show detriment. *See, e.g., Bock v. Computer Assocs. Int'l,* 257 F.3d 700, 711 (7th Cir. 2001) (concluding that ERISA estoppel did not apply because there was no showing of economic detriment); *id.* ("Bock does not prevail on an estoppel theory because there was no showing of detrimental reliance"); *Gallegos,* 210 F.3d at 811 (rejecting plaintiff's ERISA estoppel argument, where the plaintiff "ha[d] not demonstrated that she relied on UNUM's [the insurer's] representations to her detriment . . . ."); *see generally Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 649 (7th Cir. 1993) (discussing the application of waiver and estoppel in ERISA cases and stating that "[t]o the extent that the common law will sometimes hold parties to the terms of a misleading representation for no reason other than the circumstance that such a misleading representation was made, such is not the common law of ERISA in this Circuit.").

In the present matter, Plaintiff has presented no evidence that he relied on Ms. Glaser's representations to his detriment. Ms. Glaser's putative misrepresentation did not cause Plaintiff to miss any filing deadlines in submitting his application for benefits to the Plan. Furthermore,

29

the delay in receiving the Plan documents did not work to Mr. Jacobs's detriment, because once

he submitted his application for benefits, it was denied, the Plan Administrator denied his appeal,

and this Court affirmed that decision as neither arbitrary nor capricious. (*See* D.E. 58.) Ms.

Glaser's failure to send along the documents did not even drive Mr. Jacobs to the expense of

hiring a lawyer—he was already represented by counsel when the putative misrepresentations

were made.

Accordingly, because Plaintiff has shown no evidence that he relied on Ms. Glaser's

representations to his meaningful detriment, he has not established all of the elements of the

"familiar, clear, tested, administrable" doctrine of estoppel articulated in *Jones. See id.*, 16 F.3d

at 145. The Seventh Circuit has cautioned against stretching the plain language of Section

1132(c), which only provides for assessing the statutory penalty against the plan administrator,

beyond the established bounds of the estoppel doctrine. *See id.* Therefore, the Court rejects

Plaintiff's claim that Xerox is estopped to deny that it is the plan administrator for the purposes

of Section 1132(c) liability.[13]

---

[13] The Court appreciates that a showing of prejudice is not a *sine qua non* for the
imposition of statutory penalties under Section 1132(c), notwithstanding that it is a factor that
may be considered by a district court in evaluating whether discretion should be exercised to
impose any penalties. Caselaw has not examined how that issue intersects with the detriment
element of estoppel so firmly established in Seventh Circuit law. No authority has been cited,
nor meaningful argument made, that this Court should disregard well-settled Seventh Circuit law
teaching that detriment is an element of an estoppel showing, and so the Court applies that settled
precedent. However, and as explained further below, *see* Section III.E, *infra*, even if Plaintiff
were eligible for receipt of discretionary penalties for failure to timely receive plan documents,
the Court would not exercise its discretion in Mr. Jacobs's favor on the facts and circumstances
presented. This is true, among other reasons explained elsewhere, because of his inability to
show any meaningful prejudice from the belated production. *Accord, e.g., Fenster v. Tepfer &
Spitz, Ltd.*, 301 F.3d 851, 858 (7th Cir. 2002) ("This district court reasonably determined that no
penalty was required because T & S's failure to comply with the statute [29 U.S.C. § 1132(c)]
did not materially prejudice the defendants.") (citation omitted).

D.   The Administrator Should Not Be Held Responsible For Not Responding To The November 5, 2002 Letter

Plaintiff also argues that the November 5, 2002 Letter—sent to the attention of "Administrator of Xerox's Long Term Disability Plan," but incorrectly addressed to Xerox's Brookfield, Wisconsin location rather than to the address of the Plan Administrator in Connecticut—should trigger liability for the Plan under Section 1132(c). (*See* Pl. Ex. 6.) Plaintiff's arguments in this regard rest on the estoppel claim and the *alter ego* claim that the Court has previously rejected. (*See, e.g.*, D.E. 79 at 3-4 (arguing that Plaintiff is in fact making an estoppel argument related to the November 5, 2002 Letter based on Ms. Glaser's misrepresentations and the language in the SPD).) In the interest of completeness, the Court has also determined that, independent of the estoppel and *alter ego* theories advanced by Plaintiff, the November 5, 2002 Letter is insufficient to impose liability on the Plan.[14]

As an initial matter, the Court finds that the November 5, 2002 Letter gave "clear notice of what information the beneficiary desire[d]," and so under the Section 1024(b) and the applicable case law, would have triggered the Plan Administrator's obligation to send Mr. Faraci the Plan documents. *See, e.g., Anderson*, 47 F.3d at 247. However, in this instance, the clear notice was never received by the correct person, because Mr. Faraci did not send the November 5, 2002 Letter to the Plan Administrator's address. Instead, he mailed it to Xerox's offices in Brookfield, Wisconsin, where the evidence suggests that the Letter was delivered and signed for

---

[14] In considering whether the November 5, 2002 Letter could trigger Section 1132(c) liability for the Plan, the Court notes that this argument also fails for the independent reason (discussed previously) that only the plan administrator may be penalized under the statute. *See, e.g., Van Hoey v. Baxter Int'l, Inc.*, No. 96 C 6231, 1997 WL 665855, at *7 (N.D. Ill. Oct. 21, 1997) (Zagel, J.) (citing *Klosterman v. Western Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994)).

by "A. Bouge," an individual who has not been identified to the Court. This individual apparently did not forward the Letter to Mr. Becker in Stamford, Connecticut. There was no evidence presented at the hearing that the Plan Administrator ever received the November 5, 2002 Letter.

In *Romero v. SmithKline Beecham*, then-Circuit Judge Alito addressed the question of when Section 1132(c) liability could be imposed upon a plan administrator. *See id.*, 309 F.3d at 119. The Third Circuit concluded that it was error to find that Section 1132(c) liability could not be imposed simply because the plan participant sent her information and document requests to the employer's benefits representatives, rather than to the plan administrator. *See id.* Rather than hinging upon whether the request for information was addressed to the plan administrator, the court instructed that Section 1132(c) liability depended upon whether the request "actually reach[ed]" the plan administrator. *Id.* As the court put it:

> [W]e believe that section 502(c)(1) requires actual receipt by the administrator. This interpretation is supported by the statute's reference to an administrator "who . . . fails or refuses to comply with a request for . . . information." It is not customary to refer to a person's failure or refusal to comply with a request that has never been received. Furthermore, it is unlikely that Congress wanted to impose a civil penalty on a person who has not engaged in any wrongful conduct.

*Id.* at 119-20.

The Court adopts the reasoning of the Third Circuit and then-Circuit Judge Alito from *Romero*. Even if one puts aside the fundamental issue that Mr. Becker, the plan administrator never was named as a party, there is no evidence that Mr. Becker ever received notice of the November 5, 2002 Letter. Moreover, imposing a penalty on the Plan Administrator when he did not receive the request for documents would appear to be at odds with the Seventh Circuit's

guidance that the purpose of Section 1132(c) is not so much to punish as it is to induce plan administrators to comply with the notice requirements of ERISA. *See, e.g., Winchester*, 942 F.2d at 1193; *see also Romero*, 309 F.3d at 119-120 (reflecting that liability under Section 1132(c) is personal as to the administrator). Accordingly, because Plaintiff failed to adduce any competent proof that the plan administrator received notice of the November 5, 2002 Letter,[15] which was sent to a location in another state, the Court finds that the Letter did not trigger Section 1132(c) liability.

E.      The Court Finds That No Penalty Should Be Assessed For The Delayed Response To Plaintiff's April 4, 2003 Letter or Otherwise

Plaintiff argues in the alternative that, should the Court find that the 2002 letters to Ms. Glaser, and the November 5, 2002 Letter do not warrant imposing Section 1132(c) liability, "the Plan should be held liable from April 4, 2003, the date on which Mark DeBofsky wrote to Lawrence Becker (the Plan Administrator) requesting the documents, until May 27, 2003." (D.E. 74 at 9.) While the evidence indicates that the Plan Administrator responded to the April 4, 2003 Letter shortly after the thirty days permitted by Section 1132(c), the Court concludes that the short delay, and the overall set of facts and circumstances in the case, do not warrant a discretionary penalty under the statute.

First, Plaintiff never named Mr. Becker as a defendant to this suit, notwithstanding that it was clear, even before trial, that there was, at a minimum, a real issue about whether Plaintiff had sued the correct party on the Section 1132(c) claim. Given that Section 1132(c) provides for potential liability against the plan administrator, the failure to name the administrator precludes

---

[15]      Plaintiff did not call Mr. Becker as a witness, nor, it seems, attempt to depose him.

relief against him. Nor has Plaintiff shown any reasonable basis, as explained above, for holding the named Defendant, the ERISA plan, accountable for any failings of Mr. Becker with respect to the April 4, 2003 Letter.

Even if this problem did not exist, however, the Court would decline to exercise its discretion to impose a penalty concerning the April 4, 2003 Letter, which prompted the provision of plan documents to Mr. Jacobs on May 28, 2003. As an initial matter, with respect to this letter, the evidence shows that the April 4, 2003 Letter (unlike Plaintiff's letters of March 5, March 26, April 10, May 8, and November 5, 2002), was sent to the Plan Administrator, at the proper Stamford address. The evidence also shows that the letter was received by the Administrator there. Therefore, there is no issue regarding whether the Plan Administrator actually received the April 4, 2003 Letter.

Next, the Court considers whether the April 4, 2003 Letter provided clear notice to the Plan Administrator that Plaintiff was seeking the Plan documents, such that the statutory period should be considered to have started running upon receipt of that letter. *See, e.g., Anderson*, 47 F.3d at 247. The April 4, 2003 Letter states:

> Please be advised that we represent David Jacobs, a former employee of Xerox Corporation. Due to a difficulty in determining the proper agent for service for the Xerox Corporation Long Term Disability Plan, we have only just been advised to contact you. Enclosed, please find correspondence between this office and Thompson Coburn, correspondence between Xerox and previous counsel, as well insurance and medical records regarding Mr. Jacobs.
>
> Please consider this letter a claim for benefits under the plan. I would appreciate it if you would forward all of the aforementioned documents to the appropriate person at Xerox so that Mr. Jacobs may perfect his claim for long-term disability benefits. I would also appreciate it if you would respond to this letter and provide the name of the proper individual to expedite the claim process.

34

(D.E. 13, Att. 1 at 0001.) Reviewing the face of the April 4, 2003 Letter, it does not contain an explicit request for the Plan documents; the statement, "[p]lease consider this letter a claim for benefits under the plan," does not notify the Plan Administrator that the Plaintiff is seeking the Plan documents. Instead, the request(s) for the Plan documents came in the enclosures referred to in the April 4, 2003 Letter, specifically in the attached March 26, 2002 and May 8, 2002 Letters. (*Id.* at 0008-0009.) Because the body of the April 4, 2003 Letter directs the Plan Administrator to "forward all of the aforementioned documents [the enclosures] to the appropriate person at Xerox so that Mr. Jacobs may perfect his claim for long-term disability benefits" (*id.* at 0001), the Plan Administrator would have been alerted to the need to review the attachments to the April 4, 2003 Letter. Although Defendant makes a fair point that it may have been unclear to Mr. Becker whether the document requests in the attached letters had already been filled (D.E. 76 at 5), upon reviewing the attachments, Mr. Becker could have been expected to check and make sure one way or the other. Thus, the Court finds that, while the April 4, 2003 Letter itself did not provide a clear request for Plan documents, the combination of the Letter and its attachments at least potentially serves as sufficient notice.

Thus, the receipt of the April 4, 2003 Letter at least potentially triggered the Plan Administrator's obligations under Section 1132(c), and the Court will assume that to be the case *arguendo* in assessing whether discretionary penalties would be appropriate for non-provision of documents. The parties have stipulated that the Plan documents were mailed by the Plan Administrator to Mr. DeBofsky on May 27, 2003 and were received on May 28, 2003. (Tr. at 37.) The next step of the Court's analysis, therefore, is to determine the length of the period of untimely response. Plaintiff asserts that the Plan would be liable from April 4, 3002 to May 27,

2003, or 54 days. (D.E. 74 at 9.) With respect, Plaintiff's argument is not supported by the statute. Section 1132(c) imposes liability on the plan administrator for his or her failure or refusal to comply with a request for information within 30 days, and the statute indicates that the assessment of penalties against the plan administrator should begin "from the date of such failure or refusal . . . ." 29 U.S.C. § 1132(c)(1). Therefore, under the language of the statute, the clock did not start running until Mr. Becker failed to send the documents within 30 days of the request in the April 4, 2003 Letter. That means that the period of potentially sanctionable delay began on May 4, 2003 and ended on May 27, 2003, and so constituted 24 days.

As stated above, whether or not sanctions are awarded for violations of Section 1132(c) is a matter within the Court's discretion. *See* 29 U.S.C. § 1132(c); *accord, e.g., Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 858 (7th Cir. 2002) (stating that "[i]t is within the district court's discretion to determine whether to award statutory penalties [under Section 1024(b)(4)]" and that "[a] fine is not mandatory even upon a finding of a violation of § 1024(b)(4).") (citation omitted). In deciding whether to assess penalties for untimely responses, appropriate factors to be considered include the length of the delay, the number of requests made and documents withheld, whether there is evidence that the administrator acted in bad faith, and whether assessing a fine would further any purpose of ERISA. *See, e.g., Romero*, 309 F.3d at 120 (collecting appellate authorities); *Devlin*, 274 F.3d at 90. In addition, the Court may consider whether the plaintiff was materially prejudiced by the delay in receiving the documents, although that is not a prerequisite to recovery. *See, e.g., Fenster*, 301 F.3d at 858.

Considering the aforementioned factors, the Court does not believe that sanctions are warranted in the present matter. The 24-day length of the delay is minimal. There also is no

36

evidence or even suggestion in the record that the administrators of the Xerox benefits plan have been chronically deficient or lackadaisical in responding to properly tendered requests. In addition, Plaintiff sent only a single proper request for documents to the Plan Administrator—while Plaintiff previously issued multiple requests for Plan documents, as has been discussed at length, those requests were misdirected and are not counted against the Plan Administrator—which weighs against assessing penalties. Moreover, there is no indication that Mr. Becker's delay in responding to the April 4, 2003 Letter was the result of bad faith. In fact, after reviewing the evidence in the case, the Court believes that the most plausible explanation for the delay is that the face of the April 3, 2004 Letter did not make a particularly clear request for documents (if a request of sufficient clarity was made at all), and instead the request was effectively "buried" in the attachments. Finally, the Court has already found that there is no evidence that Plaintiff suffered prejudice as a result of any delay in receiving the Plan documents. Given that the relatively short delay does not appear to have been the result of bad faith and did not prejudice the Plaintiff, the Court determines in its discretion that statutory penalties are not warranted for the delayed response to the April 4, 2003 Letter.

Moreover, in the present matter, considerations of general fairness would appear to weigh against assessing a penalty against the Plan. The assets of the Plan are available to pay the claims of sick or disabled people, and little seemingly would be gained from an equitable perspective in diverting some of those assets to pay discretionary fines and potential attorneys fees (in a case where the trial did not even involve the appropriate potential defendant) as opposing to having them available for health and disability benefits.

Finally in this regard, in the interests of completeness, the Court notes that even if some

of its analyses above were incorrect (such that one of the earlier letters somehow could be seen as having provided appropriate notice to the plan administrator), the Court would not exercise its discretion to impose penalties against the Plan assets. There has been no showing of bad faith or malice on the part of anyone. The Court thus finds it imprudent to "punish" the plan by diverting plan assets otherwise available for sick or disabled workers because of a non-provision of documents by people who cannot be controlled by those sick or disabled individuals. That is especially true where, as here, Plaintiff failed to make any winning claim to benefits under the Plan anyhow, and thus suffered no substantial prejudice from the belated production of the plan documents. In this regard, the Court is mindful of repeated Supreme Court teaching about how ERISA is a "'comprehensive and reticulated statute,'" that is the outgrowth of many years of reflection and analyses by Congress. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quoting *Mertens v. Hewitt Associates* 508 U.S. 248, 251 (1993)). Similarly, that teaching explains that "ERISA's 'carefully crafted and detailed enforcement scheme provides "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly."'" *Great-West*, 534 U.S. at 209 (quoting *Mertens*, 508 U.S. at 254 (in turn quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)) (emphases in originals).

There was a straightforward way for Plaintiff to open the potential for discretionary penalties for any untimely failure to provide him with properly requested plan documents—namely, sue the plan administrator and proceed to trial against him. Plaintiff failed to do so, and little is to be gained—at least in a setting where Plaintiff has suffered no substantial prejudice and no evidence of fraud or malice exists—from blurring the lines in the sophisticated

ERISA regime by imposing penalties via a free-wheeling approach that disregards the distinctions between the plan administrator, on the one hand, and the plan sponsor and plan, on the other. In sum, the equities of this case do not call for imposition of the discretionary penalties and attorneys fees requested.

IV.     Plaintiff's Untimely Request to File an Amended Complaint Is Respectfully Denied

Plaintiff moved to file a proposed third amended complaint—by which he would add two new parties—well after the evidentiary hearing/trial on his Section 1132(c) claim had concluded and after virtually all of the extensive briefing on the issue of whether Plaintiff had sued the correct party on the claim had been filed. (D.E. 89.) For the reasons stated below, the Court respectfully denies the motion to file yet another amended complaint. Denial of the motion is appropriate because (1) Plaintiff unduly delayed in filing the proposed amendment; (2) the defendants would be unduly prejudiced if the amendment were allowed; and (3) Plaintiff already was given the chance to file three complaints (the initial complaint and two subsequent amended complaints) in the case before the evidentiary hearing was held. Allowing a fourth complaint—which would trigger an additional round of post-hearing discovery, involving new parties who previously were readily identifiable, and likely another hearing—is not appropriate or sensible, given that Plaintiff has had a full and fair chance to litigate the claim.

The law concerning whether to grant a motion to file a proposed amended complaint is well settled. "Although leave to amend shall be freely given when justice so requires, Fed. R. Civ. P. 15(a), leave is inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of

amendment." *Villa v. City of Chicago*, 924 F.2d 629, 632 (7th Cir. 1991). While "delay alone is an insufficient reason to deny [a] proposed amendment, there is a 'sufficient basis for denial of leave to amend . . . when the delay has caused the opposing party undue prejudice.'" *Chavez v. Illinois State Police*, 251 F.3d 612, 633 (7th Cir. 2001) (quoting *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1391 (7th Cir. 1983)). On this score, the Seventh Circuit has further explained that, "the longer the delay, the greater the presumption against granting leave to amend . . . [and] when extreme, delay itself may be considered prejudicial." *King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994) (collecting cases; internal quotation marks and citations omitted). "Undue prejudice occurs when the amendment 'brings in entirely new and separate claims, adds new parties, or at least entails more than an alternative claim or a change in the allegations of the complaint' and when the additional discovery is expensive and time-consuming." *In re Ameritech Corp. v. Computer Systems Solutions, Inc.*, 188 F.R.D. 280, 283 (N.D. Ill. 1999) (quoting *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Corp.*, 68 F.R.D. 383, 385 (N.D. Ill. 1975)). Precedent teaches that it is "within a district court's discretion to deny an amendment to the pleadings for delay and prejudice to the opposing party." *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1379 (7th Cir. 1990); *accord, e.g., Hindo v. University Services/The Chicago Medical School*, 65 F.3d 608, 615 (7th Cir. 1995) (collecting cases).

Plaintiff's proposed amendment must be denied because of Plaintiff's undue delay and the prejudice to Defendant that would result if the filing of the proposed third amended complaint were allowed. In this regard, the record makes clear that Plaintiff has been apprised of the issue of whether he filed suit against the correct party on the Section 1132(c) claim—and was

concomitantly advised of his potential need to sue defendants who were not parties to the suit, such as, most notably, Mr. Becker, the Plan Administrator—for well over a year before Plaintiff filed the proposed third amended complaint. Specifically, the Court raised the issue, at least in general form, in its opinion of January 2005. (D.E. 58 at 26 n.17.) The named Defendant to the litigated Section 1132(c) claim—*i.e.*, the Xerox Corporation Long Term Disability Income Plan—also raised the issue in advance of the evidentiary hearing on the claim. (D.E. 69 at 3, 4.) Defendant again squarely raised the issue in July of 2005, in its "Post-Trial Memorandum in Support of Judgment for Defendant on Plaintiff's ERISA 502(c) Claim."[16] *See, e.g.*, D.E. 76 at 9 ("In a case in which a plaintiff sought to impose liability under ERISA § 502(c) on a plan administrator for violation of duties imposed by ERISA on plans, the Seventh Circuit has expressly noted that Section 502(c) refers to duties of plan administrators, not benefit plans.") (internal quotation marks and citation omitted); *id.* at 10 ("Under the plain language of ERISA § 502(c), then, sanctions are permitted only for failures of the plan administrator, and only against the plan administrator."). All of these clear warnings, multiple of which occurred before the evidentiary hearing on the claim was held in June 2005, occurred well before Plaintiff moved to file the third amended complaint in November 2006. (D.E. 89.) Plaintiff offers no reason to justify the delay in proffering the third amended complaint.

The undue and unexplained delay before filing the proposed third amended complaint independently justifies denial of the motion to amend, as explained further below. Before

---

[16] Section 1132(c) of Title 29 of the United States Code is also referred to, at times, in the briefing as ERISA § 502(c). The two terms refer to the same statutory provision at issue in this opinion. *See generally, e.g., Kollman v. Hewitt Associates, LLC*, 487 F.3d 139, 143 (3d Cir. 2007) (reflecting the identity of the two provisions).

addressing that subject further, however, the Court notes that this is not a case where the delay

before presenting the proposed amendment would cause no prejudice. Plaintiff proposes to add

entirely new parties, who have not been a part of the discovery process, nor were they present at

the evidentiary hearing on the claim. As a result, if the proposed amendment were

allowed—such that Mr. Becker, the plan administrator, and Xerox Corporation, the plan sponsor,

were added as parties—discovery would need to be reopened. (*See generally* D.E. 94 at 9-10

(explaining new discovery that reasonably would be sought).) In addition, it is likely that another

evidentiary hearing would need to be held, and the claim could not be resolved in any event

without engaging in either a second hearing/trial or a second round of summary judgment

motion(s). Precedent acknowledges that a long period of time before the filing of a proposed

amendment increases the likelihood that prejudice will ensue if the amendment were

allowed—*see, e.g., King*, 26 F.3d at 723 (collecting cases)—and the litigation history in this case,

as well as the events that would unfold if the amendment were allowed, confirm that that general

presumption is correct on the facts of this case. It has long been recognized that an amendment

should not be allowed where it would causes non-movants undue prejudice—*see, e.g., Hindo*, 65

F.3d at 615 (collecting cases)—and here, the prejudice would be exacerbated because the

proposed third-amended complaint would add entirely new parties to the litigation. *Accord, e.g.,*

*Ameritech Corp.*, 188 F.R.D. at 283 (stating that, "[u]ndue prejudice occurs when the amendment

'brings in entirely new and separate claims, adds new parties, or at least entails more than an

alternative claim or a change in the allegations of the complaint'") (quoting *A. Cherney Disposal*

*Co.*, 68 F.R.D. at 385).

These circumstances lead the Court to find that the motion to file a third amended

complaint should be denied, both because Plaintiff unduly delayed in filing the latest proposed amendment and also, independently, because if the amendment were allowed, if would cause undue prejudice to the non-movants. As stated above, Plaintiff offers no serious reason for the delay before the filing of the proposed third amended complaint, which also cuts against allowing it. *See, e.g., Park v. City of Chicago*, 297 F.3d 606, 613 (7th Cir. 2002) (affirming denial of motion to amend and holding that, where the plaintiff "knew or should have known of the City's possible violation," her "six-month wait constituted undue delay."); *Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996) (affirming denial of motion to amend complaint filed 16 months after the original complaint was filed and more than a year after the discovery of the document upon which the proposed amendment was based). Moreover, the prejudice that the non-movants would suffer if the motion to amend were granted is evident. It is well-established that additional discovery and, as here, an inevitable need for a second round of summary judgment briefing and/or another trial constitute undue prejudice sufficient to require denial of a proposed amendment—particularly where, as here, the movant has had a full chance to litigate his case and the case otherwise will be concluded. *See, e.g., Continental Ban v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) ("If the amendment were allowed, the bank would have been put to additional discovery, and thus prejudiced. We conclude that the district court did not abuse its discretion in refusing the amendment because of undue delay."); *Ferguson v. Roberts*, 11 F.3d 696, 706-07 (7th Cir. 1993) (affirming denial of motion to amend where proposed complaint contained new claims "which would undoubtedly require additional discovery" and there was a "fast-approaching trial date"); *see also Perrian v. O'Grady*, 958 F.2d 192, 195 (7th Cir. 1992) ("'Eleventh hour additions . . . [are] bound to produce delays that burden not only the parties to

43

the litigation but also the judicial system and other litigants.'").

V.    CONCLUSION

For the reasons set forth above, the Court enters judgment for the Defendant on Section

1132(c) claim.

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 10/15/07